43 F.3d 1472
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Maureen HANSEN, et al., Plaintiffs-Appellants,
v.
WESTERVILLE CITY SCHOOL DISTRICT, BOARD OF EDUCATION, et
al., Defendants-Appellees.
 Nos. 93-3231, 93-3303.
 United States Court of Appeals, Sixth Circuit.
 Nov. 7, 1994.
 
 Before: NELSON, SUHRHEINRICH and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 This is a civil rights case, based in part upon alleged First Amendment violations, in which the plaintiffs appeal from a summary judgment in favor of the defendants. Upon de novo review, we conclude that summary judgment was not appropriate with respect to two of the plaintiffs' claims--one arising from the alleged exclusion of opponents of a school tax levy from a public meeting of the defendant school board, and the other based on the alleged confiscation of literature opposing the levy. We shall affirm the judgment of the district court as to the plaintiffs' remaining claims.
 
 
 2
 * The plaintiffs, residents of Westerville, Ohio, were members of an organization called Citizens Against Tax Waste ("CATW"). This organization opposed a series of tax levies proposed by the Westerville City School District Board of Education.
 
 
 3
 On April 27, 1988, the board held an informational meeting at a local school. When they arrived at the meeting, defendants Ernest Husarik, superintendent of schools, and J. Michael Hayfield, assistant superintendent, encountered plaintiff Margaret McIntyre. With help from her teenage son and his girlfriend, Mrs. McIntyre was distributing flyers opposing the latest levy proposal. The distribution took place in front of a school building. Dr. Husarik and Mr. Hayfield allegedly "snatched" some flyers from one of the teenagers and informed Mrs. McIntyre that the flyers violated Ohio's election laws.[1] They also told Mrs. McIntyre that it was illegal to distribute her materials on school property and that she must leave the premises. The school officials are said to have threatened to call the police, but did not do so. Mrs. McIntyre continued to distribute the materials, and she left when the board meeting began. A similar incident took place a day later.
 
 
 4
 At a public meeting of the school board held on September 12, 1988, Dr. Donald Miller, the then president of the board, announced that 45 minutes would be allotted for public participation. Each speaker, he said, would be given five minutes. (Although the board had not previously limited public comment at its meetings, controversy over the proposed levies had recently led to unusually high attendance; the August meeting had evidently run until after midnight, and as many as 60 people had spoken at that meeting.) Only five members of the public were initially recognized to speak on September 12, but because each of them spoke for more than five minutes, they consumed all the allotted time. At the end of the 45 minutes Dr. Miller announced the conclusion of the public participation period.
 
 
 5
 Following a recess, Dr. Miller stated that the board would move to the next item on the agenda. At this point Gordon Rood, one of the plaintiffs, insisted that additional spectators be permitted to address the board. (Mr. Rood himself had not asked to be heard during the public participation period.) Dr. Miller ruled Mr. Rood out of order, but Rood continued to pace about the podium and declaim loudly, insisting that "we'll talk until we're heard."
 
 
 6
 After a temporary adjournment, Dr. Miller announced that the board would allow an additional 15 minutes for public comment at the end of the meeting. Mr. Rood again interrupted and announced that the meeting would not continue until the people who wished to speak were permitted to do so.
 
 
 7
 At this point plaintiff Maureen Hansen approached the podium and began to speak without having been recognized. Although ruled out of order, she continued to talk. The board allowed her to complete her remarks. Following Ms. Hansen's comments, Mr. Rood again objected to the board's proceeding to the next agenda item. Westerville City Police Officer Richard Tiburzio, one of the defendants, then ejected Mr. Rood from the meeting for a time.
 
 
 8
 An additional opportunity for public participation was provided at the conclusion of the meeting, with five more speakers, including Mr. Rood, addressing the board. Of the 11 spectators who were heard that night, at least five were members of CATW.
 
 
 9
 Several months later, City of Columbus Chief Prosecutor James Fais watched a videotape of the September 12 meeting and concluded that there was a basis for charging Gordon Rood with disturbing a meeting in violation of Ohio Rev.Code Sec. 2917.12. Based on this conclusion, Dr. Miller filed such a charge in a state court. Mr. Rood entered a plea of no contest to a reduced charge of disorderly conduct, but the state court ultimately acquitted him, based primarily on its review of the videotape. Mr. Rood now contends that Dr. Miller's filing of the charge constituted malicious prosecution.
 
 
 10
 Prior to a public board meeting scheduled for October 24, 1988, the board made arrangements to have Officer Tiburzio present. According to Officer Tiburzio, Dr. Husarik indicated that he wanted to make sure that there was no breach of the peace and that there were no problems between pro-levy and anti-levy people. The plaintiffs allege that Husarik and Tiburzio agreed in advance on a hand signal that would indicate that Tiburzio was to remove somebody from the meeting. Officer Tiburzio denies that they pre-arranged any hand signals, and there is no evidence that they did so.
 
 
 11
 According to Mr. Rood, Dr. Miller phoned him prior to the October 24 meeting and indicated that "he would allow all persons who wanted to speak the opportunity to address the Board on October 24, 1988." Dr. Miller has neither confirmed nor denied that he gave Mr. Rood this assurance.
 
 
 12
 The board had instituted a new public participation policy under which the floor would be open for 45 minutes of public comment and those who wished to speak would be required to sign up in advance. The plaintiffs knew of this procedure and understood that compliance was necessary in order to be recognized to speak. Except for Jerry Bresee, all of the plaintiffs attended the October 24 meeting; most of them were wearing CATW buttons.
 
 
 13
 Because of the large number of people who had signed up to speak, Board President Miller announced at the beginning of the public comment period that there was insufficient time to accommodate everyone. Preference, he said, would be given to those who had not spoken at a previous board meeting.
 
 
 14
 After 47 minutes of public comment, during which time 11 people addressed the board, Dr. Miller announced that time would permit only two more speakers. He identified Del Waggoner, a CATW member and husband of one of the plaintiffs, and Jack Sandman, a levy supporter, as the two who would be recognized. Upon the conclusion of Mr. Waggoner's remarks, but before Mr. Sandman had spoken, plaintiff Carl "Pete" Huffman took the podium to ask a question. Mr. Huffman requested two minutes, and although ruled out of order, he refused to yield. Dr. Husarik motioned for Officer Tiburzio, who radioed for backup from the police department. Officer Tiburzio then approached Mr. Huffman, escorted him out, and placed him under arrest for disturbing a lawful meeting. A jury subsequently acquitted Mr. Huffman.
 
 
 15
 Immediately following Mr. Huffman's departure, Mr. Rood, who had not signed up to speak, took the podium and refused to yield. Officer Tiburzio placed his hand on Rood's arm to guide him from the meeting. Mr. Rood pulled away from Officer Tiburzio and yelled "Get your paws off me" as the two left the room. In the foyer outside the auditorium Mr. Rood struggled with Officer Tiburzio and several other police officers, including Randall Bailey and Ted Smith. Officers Bailey and Smith have both been named as defendants. Mr. Rood was arrested for disturbing a lawful meeting and for resisting arrest. He too was subsequently acquitted by a jury.
 
 
 16
 Several of the plaintiffs had followed Huffman and Rood to the foyer. After the arrests were made, they returned to the meeting as Jack Sandman was completing his statement. Plaintiff Maureen Hansen then approached the podium and asked that everyone who had signed up to speak be permitted to do so at the end of the meeting. She was ruled out of order, and Officer Tiburzio escorted her from the room. As Ms. Hansen left the auditorium, several of the plaintiffs left the meeting for a second time to observe the activities in the foyer.
 
 
 17
 The group then reentered the auditorium and plaintiff Lou Waggoner took the podium. She was ruled out of order, and three police officers escorted her to the foyer, followed again by several of the plaintiffs. The plaintiffs allege that Officer Tiburzio asked those who were in the foyer, including several who had not spoken at all during the meeting, to leave the building. He allegedly threatened them with arrest if they reentered the meeting. The plaintiffs thereupon left the building.
 
 
 18
 The final episode at issue in this action occurred on October 29, 1988, when plaintiffs Carl Huffman and Jerry Bresee carried placards at a busy intersection in Westerville protesting Huffman's treatment at the hands of the police and the school board. They allege that while they were carrying their signs, defendant Police Officer Don Ross and another unidentified officer approached them in a threatening manner and demanded that they identify themselves. They were not arrested.
 
 
 19
 In July of 1989, 12 plaintiffs filed this action in the United States District Court for the Southern District of Ohio. Named as defendants were the school board and its members; Officers Tiburzio, Smith, Bailey, and Ross; and the City of Westerville. The complaint alleged violations by all defendants of 42 U.S.C. Sec. 1983, based on alleged violations of the plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution; false arrest and malicious prosecution by the board and Officer Tiburzio with regard to Rood and Huffman; assault and battery by Officers Tiburzio, Smith, and Bailey against Mr. Rood; and assault and battery by Officer Ross against Mr. Huffman and Mr. Bresee.
 
 
 20
 On February 19, 1993, the district court entered summary judgment in favor of all defendants as to all counts. Eleven of the plaintiffs have appealed the district court's order.[2]
 
 II
 
 21
 * To prevail on a motion for summary judgment, the moving party must "show that there is no genuine issue as to any material fact and that the ... party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate against a party who, having been called upon to do so, fails to come forward with evidence tending to establish a disputed element of that party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). This court reviews summary judgment proceedings de novo, making all reasonable inferences in favor of the nonmoving party. EEOC v. Univ. of Detroit, 904 F.2d 331, 334 (6th Cir.1990).
 
 B
 
 22
 We turn first to the claims against the police officers and the City of Westerville. The officers are charged with having committed the state-law torts of assault and battery, false arrest, and malicious prosecution, in addition to having violated the plaintiffs' federal constitutional rights under the First and Fourth Amendments, as made applicable to the states by the Fourteenth Amendment.
 
 1. State Claims
 
 23
 The only claim involving Officer Ross is an alleged assault and battery against plaintiffs Jerry Bresee and Carl Huffman. Bresee and Huffman allege that Officer Ross approached them in a "threatening" manner and demanded to know their names. They say he held his nightstick in his hand, but they do not assert that he touched them, made a motion as if to touch them, or threatened to touch them.
 
 
 24
 Under Ohio law, tortious assault is a willful threat or attempt to harm which reasonably places another in fear of harmful contact. The threat or attempt must be coupled with a definitive act by one with the apparent ability to do the harm. Smith v. John Deere Co., 83 Ohio App.3d 398, 406, 614 N.E.2d 1148, 1154 (Franklin Co.1993).
 
 
 25
 The plaintiffs have identified neither an actual threat reasonably placing them in fear of harm nor an accompanying definitive act. No reasonable trier of fact could find that the holding of a nightstick constituted assault. In the absence of any evidence that Officer Ross acted maliciously, recklessly, or in bad faith, moreover, he is immune from liability in any event. See Ohio Rev.Code Sec. 2744.03(A)(6). The district court properly granted summary judgment in favor of Officer Ross.
 
 
 26
 We next consider a claim by Gordon Rood that his treatment at the hands of Officers Tiburzio, Bailey, and Smith after the meeting of October 24 constituted assault and battery. Mr. Rood stated that the officers were "very rough with [him]" and that he was pushed into a wall and forced down to his knees. Witnesses state that they saw the police "jostle," "attack," or "shove" him. He claimed he suffered "great pain" and that he still suffers pain from the attack; the doctor who examined him concluded that he had pulled some muscles.
 
 
 27
 The police do not deny using force to arrest Mr. Rood, but they maintain that it was necessary to effectuate the arrest. They contend that Mr. Rood was "struggling" and "out of control" and that they had to use force to restrain him. Mr. Rood admits that he pulled away from Officer Tiburzio, that he yelled "get your paws off me," and that he "struggled" with the police, but he insists that he never tried to escape or harm them.
 
 
 28
 Mr. Rood has not offered any evidence to show that the officers acted maliciously, recklessly, or in bad faith. On the contrary, the evidence suggests that the officers, faced with an admittedly "struggling" arrestee, responded in an entirely proper manner. Although there is a dispute as to how much Mr. Rood struggled and how forceful the police were, the undisputed facts compel the conclusion that the police are immune from liability by reason of O.R.C. Sec. 2744.03(A)(6). Summary judgment was proper as to this claim.
 
 
 29
 Plaintiff Raymond Brown was knocked down by the police as they were pursuing Mr. Rood, and plaintiff Margie Bean claims that one of the officers stepped on her foot. Neither Brown nor Bean claims that the police acted intentionally, and there is no evidence of any actionable misconduct in this respect.
 
 
 30
 Finally, Gordon Rood and Carl Huffman assert claims of false arrest and malicious prosecution against Officer Tiburzio. These claims stem from the events at the October 24 school board meeting, when Tiburzio charged Mr. Rood with resisting arrest and charged both Mr. Rood and Mr. Huffman with disturbing a lawful meeting in violation of Ohio Rev.Code Sec. 2917.12. (Mr. Rood was also charged with--and later acquitted of--disturbing the September 12 meeting, but Officer Tiburzio did not arrest Mr. Rood on September 12 and was not involved in any way with the filing of that charge.)
 
 
 31
 The elements of malicious prosecution are (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused. Trussell v. General Motors Corp., 53 Ohio St.3d 142, 144, 559 N.E.2d 732, 735 (1990). To maintain an action for false arrest, a plaintiff must show that he was unlawfully detained. Harvey v. Horn, 33 Ohio App.3d 24, 27, 514 N.E.2d 452, 454 (Franklin Co.1986). In determining whether an officer had probable cause to make an arrest and file criminal charges, his conduct is to be analyzed in light of the facts or circumstances known to him at the time. McFinley v. Bethesda Oak Hosp., 79 Ohio App.3d 613, 616-17, 607 N.E.2d 936, 939 (Hamilton Co.1992). The existence of a reasonable basis to believe that a crime has been committed is sufficient to defeat claims of malicious prosecution and false arrest. See id. at 620, 607 N.E.2d at 941. See also State v. McCrone, 63 Ohio App.3d 831, 835-36, 580 N.E.2d 468, 471 (Lorain Co.1989); Melanowski v. Judy, 102 Ohio St. 153, 156, 131 N.E. 360, 361 (1921). The issue is not whether a crime was actually committed, but whether a reasonable basis existed for believing the accused guilty of the crime. McFinley, 79 Ohio App.3d at 617, 607 N.E.2d at 939.
 
 
 32
 In the case at bar it is undisputed that Mr. Rood and Mr. Huffman both held forth during the October 24 meeting after having been ruled out of order repeatedly, and their conduct unquestionably "interfere[d] with the due conduct of [the] meeting." See Ohio Rev.Code Sec. 2917.12. Our review of the videotape of the meeting persuades us that the existence of probable cause to arrest and prosecute both men for disturbing a meeting is beyond dispute.
 
 
 33
 We also conclude as a matter of law that probable cause existed to arrest and prosecute Mr. Rood for resisting arrest. He admits that he pulled his arm away from Officer Tiburzio, told him to "get your paws off me," and struggled with the arresting officers. Summary judgment was proper as to the claims of false arrest and malicious prosecution against Officer Tiburzio.
 
 2. 42 U.S.C. Sec. 1983
 
 34
 We next turn to the plaintiffs' constitutional claims against the police officers and the city, raised under 42 U.S.C. Sec. 1983. First, Gordon Rood contends that Officers Tiburzio, Bailey, and Smith used excessive force in arresting him on October 24, thereby violating his Fourth Amendment right to be free of unreasonable seizures. The district court found for the police officers on the ground of qualified immunity. We agree that the officers were entitled to summary judgment as to this claim, but we do not reach the qualified immunity issue, having concluded as a matter of law that the plaintiffs failed to establish that the officers' conduct violated their constitutional rights.
 
 
 35
 Claims that police officers used excessive force in the course of an arrest are analyzed under a "reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395 (1989). Assessment of the reasonableness of the force used is an objective inquiry that depends on the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest." Id. at 396.
 
 
 36
 Taking the evidence in the light most favorable to Mr. Rood, we assume that he did not try to escape policy custody; certainly his acquittal on a charge of resisting arrest would support that finding. He admits, nevertheless, that he pulled away from officers and "struggled" with them. Mr. Rood claims that the officers pulled his arms up behind his back and shoved him against a wall, causing him pain. Although this degree of force may have been unnecessary in hindsight, we conclude as a matter of law that it was not unreasonable.
 
 
 37
 "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." Id. at 396-97 (citations omitted).
 
 
 38
 No reasonable juror could find, under the circumstances presented here, that an arresting officer acted unreasonably by pulling an admittedly struggling suspect's arms behind his back and pushing him against a wall. The district court properly granted summary judgment to Officers Tiburzio, Bailey, and Smith and the City of Westerville as to this claim.
 
 
 39
 Next, eight of the plaintiffs--Sue Bresee, Margie Bean, Raymond Brown, Jack Keller, Margaret McIntyre, Maureen Hansen, Lou Waggoner, and Carolyn Ward--maintain that after they left the October 24 meeting, Officer Tiburzio prevented them from reentering and thereby violated their First Amendment rights.[3] They allege that Officer Tiburzio identified them by their "CATW" buttons as people who would not be allowed in the meeting.
 
 
 40
 The plaintiffs had a right to attend this public meeting of the local school board. A school board meeting, when opened to the public, is a limited public forum for discussion of subjects relating to the operation of the schools. See Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 175 (1976). Although the government may place limitations on the time, place and manner of access to such forums, the restrictions must be content neutral and narrowly tailored to serve a significant governmental interest. See Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46 (1983).
 
 
 41
 "[U]nder the ... First Amendment ... government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.... Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." Police Dept. of Chicago v. Mosley, 408 U.S. 92, 96 (1972).
 
 
 42
 When a school board sits publicly to conduct public business and to hear the views of citizens, it may not discriminate among speakers on the basis of the content of their speech. See Madison Joint Sch. Dist., 429 U.S. at 176.
 
 
 43
 In the instant case, it is clear that the school board had opened the meeting to the public and had solicited public comments at the meeting, albeit for a limited period of time. If, as the plaintiffs allege, Officer Tiburzio excluded the plaintiffs from the meeting solely because they wore buttons indicating their association with Citizens Against Tax Waste, his action would be an impermissible content-based restriction on the plaintiffs' right to express themselves in a public forum.
 
 
 44
 Although the time for oral expression had already ended when the exclusion allegedly occurred, the plaintiffs' wearing of CATW buttons constituted a "silent, passive expression of opinion." See Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 508 (1969). Such a symbolic act is protected by the Free Speech Clause of the First Amendment. See id. at 505. Notwithstanding the expiration of the time for speeches by members of the public, the plaintiffs had a right to attend and to wear CATW buttons.
 
 
 45
 The district court dismissed this claim on the ground of qualified immunity. Under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Giving the plaintiffs the benefit of all reasonable inferences, we must determine "whether an objectively 'reasonable officer could have believed [the defendant's conduct] to be lawful, in light of the clearly established law and the information the ... officers possessed.' " Hall v. Shipley, 932 F.2d 1147, 1151 (6th Cir.1991) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)).
 
 
 46
 It was well established in 1988, when the cause of action arose, that members of the public had a right to attend a public school board meeting. See Madison Joint Sch. Dist., 429 U.S. at 176; Mosley, 408 U.S. at 96. A reasonable police officer in the position of Officer Tiburzio would have known that he could not exclude members of the public from a school board meeting solely on the basis of their viewpoints. Therefore, we conclude that summary judgment should have been denied as to the claims against Officer Tiburzio arising from his alleged exclusion of the plaintiffs from the October 24 meeting.[4]
 
 
 47
 The district court acted properly in granting summary judgment in favor of the City of Westerville as to this claim. A municipality cannot be held liable for the acts of an individual employee or official unless the individual acted pursuant to an official policy of the defendant body. Monell v. Dept. of Social Services, 436 U.S. 658, 691 (1978). To establish municipal liability for an injury resulting from a municipal policy, moreover, the plaintiffs " 'must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.' " Coogan v. City of Wixom, 820 F.2d 170, 176 (6th Cir.1987) (quoting Bennett v. City of Slidell, 728 F.2d 762, 767 (5th Cir.1984) (en banc), cert. denied, 472 U.S. 1016 (1985)). The plaintiffs have not produced any evidence indicating that Officer Tiburzio's decision to exclude people from the board meeting was part of a city policy of restricting access to public meetings.
 
 
 48
 Finally, the plaintiffs claim that the police and the school board conspired to prevent them from expressing their views. An action for civil conspiracy may be brought under 42 U.S.C. Sec. 1983. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).
 
 
 49
 "A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.... All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." Hooks v. Hooks, 771 F.2d 935, 943-44 (6th Cir.1985).
 
 
 50
 A complaint alleging a civil rights conspiracy must be supported by specific facts showing the "existence and scope of the alleged conspiracy." Slotnick v. Staviskey, 560 F.2d 31, 33 (1st Cir.1977), cert. denied, 434 U.S. 1077 (1978). Nothing in the record of the case at bar supports a claim that the police conspired in any way to deprive the plaintiffs of their constitutional rights. Summary judgment was proper as to the police defendants and the City of Westerville on the claim of civil conspiracy.
 
 C.
 
 51
 We next consider the plaintiffs' claim against the school board members in their individual and official capacities. An action against a government official in his official capacity is an action against the governmental entity he represents. See Kentucky v. Graham, 473 U.S. 159, 166 (1985). A municipality is a "person" subject to suit under 42 U.S.C. Sec. 1983. Monell, 436 U.S. at 690. Ohio's local school boards are treated as "municipalities" as far as amenability to suit is concerned. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280-81 (1977) (Ohio local school board is effectively a municipality, not a state, for Eleventh Amendment purposes).
 
 
 52
 As to Margaret McIntyre's claim that Dr. Husarik and Mr. Hayfield violated her First Amendment right to distribute literature opposing the school levy, it is not alleged that the actions of Husarik and Hayfield on the evening of April 24 were part of a school board "policy" of discouraging the distribution of campaign literature. See Coogan v. City of Wixtom, 820 F.2d at 176. We therefore construe this particular claim as one against Hayfield and Husarik in their individual capacities only.
 
 
 53
 To state a claim under 42 U.S.C. Sec. 1983, the plaintiff must establish that (1) the defendants acted under color of state law and (2) the officials' conduct deprived the plaintiffs of a right secured by the Constitution or a federal statute. West v. Atkins, 487 U.S. 42, 48 (1988). A public official acts under color of state law when he has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " Id. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).
 
 
 54
 There is a genuine issue of material fact as to whether Hayfield or Husarik acted under color of state law during their confrontation with Mrs. McIntyre. In this confrontation, which apparently took place on school property, Hayfield and Husarik, who were public school officials, allegedly took Mrs. McIntyre's flyers, told her to leave the school property, and threatened to call the police if she did not comply. A reasonable juror could conclude that the men were undertaking to act in an official capacity.
 
 
 55
 An issue of fact also remains whether the defendants' conduct deprived Mrs. McIntyre of her First Amendment right to free speech. Mrs. McIntyre sought to communicate her views about a public matter. This kind of communication "is entitled to the greatest constitutional protection." Glasson v. City of Louisville, 518 F.2d 899, 904 (6th Cir.), cert. denied, 423 U.S. 930 (1975). The government may not seize presumptively protected expressive materials without a prior determination that the speech is unlawful. See Fort Wayne Books, Inc. v. Indiana, 489 U.S. 46, 66-67 (1989) (seizure of books inappropriate prior to judicial determination of obscenity).
 
 
 56
 The facts alleged in this case bear some similarity to those in Glasson v. City of Louisville. In Glasson, police officers seized a poster from Ms. Glasson because it was critical of the President of the United States. We held that the police officers' actions deprived Ms. Glasson of her First Amendment right because they interfered with her expressive activity on the basis of the content of her speech. Similarly, Mrs. McIntyre alleges that the defendants' conduct interfered with the expression of her political views and that the interference was motivated by the content of her speech.
 
 
 57
 A threat to call the police made for the purpose of dissuading Mrs. McIntyre from expressing her views on the levy could have had a chilling effect on the exercise of her First Amendment rights. Where one is threatened with arrest or prosecution for exercising his right to expression, thereby chilling the exercise of that right, a constitutional violation may occur even without an arrest or prosecution. See NAACP v. Button, 371 U.S. 415, 433 (1963) ("The threat of sanctions may deter [the exercise of First Amendment freedoms] almost as potently as the actual application of sanctions"); Sloman v. Tadlock, 21 F.3d 1462, 1469 (9th Cir.1994) (police officer violated plaintiff's First Amendment rights by issuing citations and warnings with motive of deterring plaintiff's expressive activity).
 
 
 58
 We note that in order to succeed at trial on such a theory, Mrs. McIntyre will have to establish that her expression was in fact deterred or chilled by the defendants' conduct. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm...." Laird v. Tatum, 408 U.S. at 13. See also Macko v. Byron, 760 F.2d 95, 97 (6th Cir.1985) (Sec. 1983 plaintiff must establish an actual constitutional violation, not merely a threat of violation). Moreover, she must establish that the defendants threatened to call the police because of the content of her message and not merely because they were concerned about a violation of election laws. See Sloman v. Tadlock, 21 F.3d at 1469-70 (defendant's motive is relevant to ascertaining whether his conduct violated First Amendment); Mozzochi v. Borden, 959 F.2d 1174, 1179 (2nd Cir.1992) (same).
 
 
 59
 Dr. Husarik and Mr. Hayfield argue that to the extent that their conduct may have violated Mrs. McIntyre's constitutional rights, they are protected by the doctrine of qualified immunity. We disagree. Mrs. McIntyre's right to distribute political literature was clearly established at the time of these events. We conclude that a reasonable school official would have known that he could not interfere with a citizen's campaign efforts against a tax levy by confiscating her materials and threatening to call in the police.
 
 
 60
 Gordon Rood maintains that the action of Dr. Miller, president of the school board, in filing charges of disrupting the September 12 meeting constituted malicious prosecution. But charges filed in good faith and in reliance on the advice of a prosecuting attorney who is aware of the known material facts cannot form the basis of a claim of malicious prosecution. See Donohoe v. Burd, 722 F.Supp. 1507, 1520 (S.D.Ohio 1989), aff'd, 923 F.2d 854 (6th Cir.1991). In the case at bar Columbus chief prosecutor James Fais viewed the videotape of the September 12 meeting, independently concluded that there was probable cause to file charges against Mr. Rood, and so advised Dr. Miller. Dr. Miller filed the charge in reliance on this advice. Although Mr. Rood was ultimately acquitted, the state court judge found it to be "a borderline case"--and the advice of the prosecutor would provide a complete defense to the malicious prosecution claim in any event.
 
 
 61
 The plaintiffs challenge the Board's policy of limiting the number of speakers, limiting the duration of their comments, and giving preference to new speakers. We conclude that this policy was a permissible content-neutral restriction on the time, manner, and place of the plaintiffs' speech and did not violate the plaintiffs' First Amendment rights. Where regulation of speech is content neutral, is narrowly tailored to serve a significant governmental interest, and leaves open ample alternative avenues for communication, it is constitutionally valid. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984). In this case, the board's policy did not limit speech based on its content. All speakers during the public participation period were required to comply with the policy, regardless of their viewpoint. The regulation affected the timing of the speech, not its content. The plaintiffs also had ample opportunity to express their views to the board. CATW members spoke at most school board meetings in 1988, and several levy opponents spoke during the October meetings.
 
 
 62
 Although the board instituted its new policy in late 1988, when there was significant controversy over the levies, there is no evidence that the policy was aimed only at CATW members. The policy was adopted after a series of board meetings at which an unusually large number of people wished to speak. Some of the meetings were disrupted, and others ran on at great length. The policy did not disproportionately limit the right of members of any particular group to speak.
 
 
 63
 The government has a significant interest in the orderly and efficient conduct of its business. See Grayned v. City of Rockford, 408 U.S. 104, 119 (1972) (city has compelling interest in undisrupted school session); Jones v. Heyman, 888 F.2d 1328, 1333 (11th Cir.1989) (mayor's interest in controlling the agenda and preventing the disruption of public meetings is significant governmental interest); Madison Joint Sch. Dist., 429 U.S. at 176 n. 8 ("Plainly, public bodies may confine their meetings to specified subject matter...."); Wright v. Anthony, 733 F.2d 575, 577 (8th Cir.1984) (public hearing procedure limiting speech time to five minutes per speaker was a valid time, place, and manner restriction that served a significant governmental interest in conserving time and allowing others opportunity to speak).
 
 
 64
 "We are dealing not with words uttered on the street to anyone who chooses or chances to listen; we are dealing with meetings of the Norwalk City Council, and with speech that is addressed to that Council. Principles that apply to random discourse may not be transferred without adjustment to this more structured situation.... [A] city Council meeting is ... a governmental process with a governmental purpose. The Council has an agenda to be addressed and dealt with. Public forum or not, the usual first amendment antipathy to content-oriented control of speech cannot be imported into the Council chambers intact." White v. City of Norwalk, 900 F.2d 1421, 1425 (9th Cir.1990).
 
 
 65
 The public participation policy at issue in the instant case restricted the number of speakers and the amount of time each person could speak, but it did not limit the content of the speech or restrict the full range of expressive activity available outside the board meeting. The policy left open ample alternative opportunities for communication. The board held several meetings to hear public comment, and citizens were free to write or speak to board members outside the board meetings.
 
 
 66
 Other courts have upheld policies comparable to the one with which we are concerned here. See Jones v. Heyman, 888 F.2d at 1334 (upholding plaintiff's expulsion from city commissioner's meeting because plaintiff failed to follow established public participation procedures); Wright v. Anthony, 733 F.2d at 577 (upholding five-minute limit on public comments during a hearing). We conclude that the policy in this case was a permissible restriction on speech. Mr. Huffman and Mr. Rood clearly violated the policy, and the board did not act improperly by having them removed.
 
 
 67
 As to the remaining incidents--Officer Tiburzio's preventing several of the plaintiffs from reentering the meeting, the arrests on October 24, and Officer Ross' alleged assault on October 29--there is no evidence linking the board to these events. The district court acted properly in granting summary judgment to the school board and its members as to all claims.
 
 III
 
 68
 The judgment entered by the district court is REVERSED as to the claim that Officer Tiburzio improperly excluded plaintiffs from a public board meeting and as to the claims against defendants Hayfield and Husarik regarding seizure of the fliers. The judgment is AFFIRMED as to all other claims and all other defendants. The case is REMANDED to the district court for further proceedings not inconsistent with this opinion.
 
 
 69
 BATCHELDER, Circuit Judge, concurring in part and dissenting in part:
 
 
 70
 Although I concur in most of this opinion, I must respectfully dissent from the finding that Dr. Husarik and Mr. Hayfield are not entitled to qualified immunity for their actions in regard to their confrontations with Mrs. McIntyre prior to the April 27 and April 28, 1988, informational meetings. The majority concludes that there are genuine issues of fact which prevent the granting of summary judgment on qualified immunity grounds, particularly the issue of whether the defendants' conduct actually deprived Mrs. McIntyre of her First Amendment right to free speech. I would hold that it did not, and that, although the conduct of these defendants was probably reprehensible, it was not unconstitutional.
 
 
 71
 It is undisputed that on each of these occasions these defendants took only some of McIntyre's pamphlets, that on at least one of these evenings they took no pamphlets from McIntyre herself, that they merely threatened to call the police but did not do so, and that neither of these defendants had either the power or the authority actually to arrest or prosecute McIntyre. The majority analyzes these facts under NAACP v. Button, 371 U.S. 415 (1963); Glasson v. City of Louisville, 518 F.2d 899 (6th Cir.), cert. denied, 423 U.S. 930 (1975); and Sloman v. Tadlock, 21 F.3d 1462 (9th Cir.1994). I believe that there are crucial distinctions between this case and each of those cited.
 
 
 72
 The principle from NAACP v. Button which the majority applies to this case is the Supreme Court's statement that "[t]he threat of sanctions may deter [the exercise of First Amendment freedoms] almost as potently as the actual application of sanctions." 371 U.S. at 433. But in that case the Court was not addressing the actions of someone who threatens to call the police. The quoted language is part of a paragraph which addresses a statute's inhibitory effect, and in that regard, the Court said,
 
 
 73
 The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.
 
 
 74
 Id. (citations omitted). Here, the action which the majority describes as a threat of sanctions is the mere threat, which was never carried out, by two school board members to call the police. This is simply not comparable to a statute which, if applied to plaintiff, would operate as sanction.
 
 
 75
 The majority opines that the facts in Glasson v. City of Louisville bear some similarity to the facts here. I disagree. In Glasson, it was the police who seized the plaintiff's only poster. Not only was the plaintiff in Glasson left without any graphic representation of the point of view she sought to express, she was deprived of it by the law enforcement authorities themselves, who had the power to arrest her if she resisted. But in the case before us, it is undisputed that only some of McIntyre's pamphlets were taken by the defendants, the defendants were not police or other law enforcement officers, and although the defendants threatened to call the police if McIntyre continued to pass out the leaflets, she did continue her activity, but they did not call the police.
 
 
 76
 Finally, in Sloman v. Tadlock, the Ninth Circuit addressed claims against both a police defendant and a civilian defendant. The defendant police officer in that case, motivated by the content of the plaintiff's political speech, had participated in the arrest of the plaintiff, who was not violating any law at the time. 21 F.3d at 1466. The court held that qualified immunity was not warranted because a reasonable jury could have found that the plaintiff's political activity was the motivating factor in the officer's decision to issue warnings and citations, that the warnings and citations were groundless, and that the officer's conduct had chilled the plaintiff's expression. Id. at 1470. The court further held that the civilian defendant had actually signed a citizen's complaint that led to the arrest of the plaintiff, and that there were genuine issues as to whether the civilian defendant had acted in concert with the police and whether the civilian was motivated by the content of the plaintiff's political speech. Id. at 1474. But in the case before us, the defendants neither could issue warnings and citations nor did anything whatsoever to cause a warning or citation to be issued by the police.
 
 
 77
 I do not question that McIntyre's conduct was protected by the First Amendment. While I disagree with the majority's apparent disregard for the fact that the pamphlets McIntyre was passing out were in clear violation of an Ohio law which has not, even today, been held to be unconstitutional,[1] I do not believe that issue is dispositive here. And I assume, for purposes of this analysis, that defendants Husarik and Hayfield were clothed with state authority. What I cannot accept is the conclusion that these defendants' actions reasonably should have been viewed by them as violating McIntyre's First Amendment rights. McIntyre does not allege that the defendants left her with insufficient literature to cover the meetings effectively, and as noted above, she does not allege that she stopped passing out the literature either evening. The majority cites no precedent, and I have found none, that would support a holding that these school board members should have known that if they took any of McIntyre's materials they were violating her First Amendment rights.
 
 
 78
 Neither can I join in the majority's view that a threat to call the police, even when made by public school officials on public school property, is equivalent to a threat of arrest or prosecution, such that these school board members should have known that when they threatened to call the police they were violating McIntyre's First Amendment rights. It is, after all, the duty and function of the police to determine whether an arrest should be made or citations issued. I think we set an alarming precedent when we acknowledge the potential for Sec. 1983 liability for merely calling the police. And in this case, the majority agrees that these officials may be found liable merely for threatening to call the police. In short, since I do not believe that any reasonable school board official should have known that when he took some of her leaflets and threatened to call the police, regardless of his motives in doing so, he was violating McIntyre's First Amendment rights, I would affirm the district court's judgment granting qualified immunity to these defendants.
 
 
 
 [1]
 The flyer was later held to be in violation of Ohio Rev.Code Sec. 3599.09 because it did not include the name and address of the organization or person responsible for it. In 1993 the Ohio Supreme Court ruled that this statute did not violate Mrs. McIntyre's free speech rights. McIntyre v. Ohio Elections Comm'n, 67 Ohio St.3d 391, 618 N.E.2d 152 (1993). The United States Supreme Court has since granted certiorari in the case. 114 S.Ct. 1047, 62 U.S.L.W. 3550 (Feb. 22, 1994)
 
 
 [2]
 Plaintiff Lewis Hinkle did not appeal. Plaintiff McIntyre died during the pendency of the appeal, and her husband, Joseph McIntyre, has been substituted for her as an appellant
 
 
 [3]
 This is the only claim raised by seven of the plaintiffs
 
 
 [4]
 The plaintiffs have not alleged any facts indicating that the school board was involved in a decision to exclude them from the meeting. To the extent the complaint raises such a claim, summary judgment in favor of the school board was proper
 
 
 [1]
 The issue has been argued before the United States Supreme Court but no decision as of this date has been issued