OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.


McIntyre, Appellant, v. Ohio Elections Commission, Appellee.
[Cite as McIntyre v. Ohio Elections Comm. (1993),      Ohio
St.3d    .]
Elections -- Political communications must be identified --
     R.C. 3599.09 not violative of right to free speech
     guaranteed by First Amendment to United States
     Constitution and Section II, Article I of the Ohio
     Constitution.
The requirement of R.C. 3599.09 that persons responsible for the
          production of campaign literature pertaining
          to the adoption or defeat of a ballot issue
          identify themselves as the source thereof is
          not violative of the right to free speech
          guaranteed by the First Amendment to the
          United States Constitution and Section 11,
          Article I of the Ohio Constitution.
     (No. 92-1147 -- Submitted June 1, 1993 -- Decided
September 22, 1993.)
     Appeal  from the Court of Appeals for Franklin County, No.
90AP-1221.
     On April 27, 1988, appellant, Margaret McIntyre,
distributed flyers at Blendon Middle School in Westerville,
Ohio, to attendees of a meeting held to discuss the Westerville
school levy.  The levy had been placed on the May 3, 1988
primary election ballot.  Similar flyers were deposited upon
the windshields of automobiles in the school parking lot by a
relative of appellant and by another person.  The leaflets
generally expressed opposition by appellant to the school
levy.  Some of the flyers failed to include the name and
address of appellant as the person who produced them.
Appellant was apprised of the nonconformity of this campaign
literature by J. Michael Hayfield, Assistant Superintendent of
Elementary Education for the Westerville City School District.
Nevertheless, on April 28, 1988, appellant distributed similar
leaflets outside the Walnut Springs Middle School in
Westerville.
     On March 30, 1989, a complaint against appellant was filed
with appellee, Ohio Elections Commission ("OEC"), charging her,

inter alia, with violations of R.C. 3599.09 -- distribution of campaign literature without a proper disclaimer. On March 19, 1990, a hearing was held before the OEC. On March 30, 1990, appellee issued its decision finding appellant in violation of R.C. 3599.09, and fining her $100. On April 6, 1990, appellant instituted an appeal to the Franklin County Common Pleas Court. On October 2, 1990, the common pleas court reversed the decision of appellee, concluding that R.C. 3599.09 was unconstitutional as applied. On April 7, 1992, the Tenth District Court of Appeals reversed the trial court.

The cause is now before this court pursuant to the allowance of a motion to certify the record.

George O. Vaile, for appellant.
Lee I. Fisher, Attorney General, Robert A. Zimmerman and Patrick A. Devine, Assistant Attorneys General, for appellee.

A. William Sweeney, J.   The present action involves the constitutionality of R.C. 3599.09 insofar as it requires the identification of the author of campaign literature. In this regard, R.C. 3599.09 provides in relevant part:

"(A) No person shall write, print, post, or distribute, or cause to be written, printed, posted, or distributed, a notice, placard, dodger, advertisement, sample ballot, or any other form of general publication which is designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election, or make an expenditure for the purpose of financing political communication through newspapers, magazines, outdoor advertising facilities, direct mailings, or other similar types of general public political advertising, or through flyers, handbills, or other nonperiodical printed matter, unless there appears on such form of publication in a conspicuous place or is contained within said statement the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor. *** This section does not apply to the transmittal of personal correspondence that is not reproduced by machine for general distribution." (Emphasis added.)

It is the contention of appellant that the aforementioned restriction violates her right to free speech under Section 11, Article I of the Ohio Constitution, which provides in part:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

In reversing the common pleas court, the court of appeals relied upon the holding of this court in State v. Babst (1922), 104 Ohio St. 167, 135 N.E. 525. The syllabus thereto provides:

"Section 13343-1, General Code, appearing in Part Four, Title I, Chapter 18, entitled 'Offenses Relating To Elections,' in its operation does not restrain or abridge the liberty of speech as guaranteed by Section 11, Article I, Bill of Rights, but is regulatory in nature, and intended to prevent abuse of the right."

G.C. 13343-1 is the predecessor to R.C. 3599.09 and does

not differ from it to any material extent. Nevertheless, appellant questions the continued vitality of Babst in light of subsequent decisions by the United States Supreme Court interpreting the First Amendment to the United States Constitution. In particular, appellant relies upon Talley v. California (1960), 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559. In Talley, the court invalidated a city ordinance on the basis that its requirement that handbills contain the name and address of the person producing them was an unconstitutional infringement on the right to free speech. The handbills had as their purpose the organization of a consumer boycott of particular merchants who allegedly practiced racial discrimination. In concluding that the identification of the author of the handbill would run afoul of the First Amendment, the Talley court remarked:

"There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression. 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' Lovell v. Griffin, 303 U.S., at [444,] 452 [58 S.Ct. 666, 669, 82 L.Ed. 949, 954 (1938)].

"Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all. The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers and distributors would lessen the circulation of literature critical of the government. The old seditious libel cases in England show the lengths to which government had to go to find out who was responsible for books that were obnoxious to the rulers. John Lilburne was whipped, pilloried and fined for refusing to answer questions designed to get evidence to convict him or someone else for the secret distribution of books in England. Two Puritan Ministers, John Penry and John Udal, were sentenced to death on charges that they were responsible for writing, printing or publishing books. Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. Along about that time the Letters of Junius were written and the identity of their author is unknown to this day. Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes." (Footnotes omitted.) 362 U.S. at 64-65, 80 S.Ct. at 538-539, 4 L.Ed.2d at 563.

However, the ordinance at issue in Talley apparently had as its only purpose the identification of the author of the handbills. Thus, in distinguishing the ordinance from other provisions which sought to prevent the dissemination of falsehoods, the court remarked:

"Counsel has urged that this ordinance is aimed at providing a way to identify those responsible for fraud, false

advertising and libel.  Yet the ordinance is in no manner so limited, nor have we been referred to any legislative history indicating such a purpose.  Therefore we do not pass on the validity of an ordinance limited to prevent these or any other supposed evils.  This ordinance simply bars all handbills under all circumstances anywhere that do not have the names and addresses printed on them in the place the ordinance requires."  (Emphasis added.)  362 U.S. at 64, 80 S.Ct. at 538, 4 L.Ed.2d at 562-563.

In contrast to the ordinance at issue in Talley, appellee can legitimately claim that R.C. 3599.09 has as its purpose the identification of persons who distribute materials containing false statements.  R.C. 3599.091(B) and 3599.092(B)(2) prohibit persons from making false statements during campaigns for public office and ballot issues, respectively.  Accordingly, unlike Talley, the disclosure requirement is clearly meant to "identify those responsible for fraud, false advertising and libel."  Moreover, in First Natl. Bank of Boston v. Bellotti (1978), 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707, the United States Supreme Court, while concluding that a state statute prohibiting corporate expenditures opposing or supporting ballot issues was violative of the First Amendment, nevertheless acknowledged that requirements such as the one at issue in the case herein were permissible.  In rejecting the argument of the state that restrictions on corporate speech were necessary in order to allow alternative voices to be heard, the court remarked as follows:

"Moreover, the people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments.  [Footnote omitted.]  They may consider, in making their judgment the source and credibility of the advocate.  [Court's footnote 32.]  435 U.S. at 791-792, 98 S.Ct. at 1423-1424, 55 L.Ed.2d at 727-728.

The court's footnote 32 states:

"Corporate advertising, unlike some methods of participation in political campaigns, is likely to be highly visible.  Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected.  See Buckley [v. Valeo], 424 U.S. [1], at 66-67 [96 S.Ct. 612, at 657-658, 46 L.Ed.2d 659, at 714-715 (1976)]; United States v. Harriss, 347 U.S. 612, 625-626 [74 S.Ct. 808, 815-817, 98 L.Ed. 989, 1001] (1954).  In addition, we emphasized in Buckley the prophylactic effect of requiring that the source of communication be disclosed.  424 U.S., at 67 [96 S.Ct., at 657, 46 L.Ed.2d, at 715]."  (Emphasis added.)  435 U.S. at 792, 98 S.Ct. at 1424, 55 L.Ed.2d at 728.

Significantly, the court made this observation in a case where it also stated that a governmental entity was required to demonstrate a compelling interest to justify a restriction on First Amendment rights.  However, in Burdick v. Takushi (1992), 504 U.S.    , 112 S.Ct. 2059, 119 L.Ed.2d 245, the court, in upholding the ban on write-in voting instituted by the state of Hawaii, recognized a different standard.  The court observed as follows:

"Election laws will invariably impose some burden upon individual voters.  Each provision of a code, 'whether it

governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects -- at least to some degree -- the individual's right to vote and his right to association with others for political ends.' Anderson v. Celebrezze, 460 U.S. 780, 788 [108 S.Ct. 1564, 1569-1570, 75 L.Ed.2d 547, 557] (1983). Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently. See Brief for Petitioner 32-37. Accordingly, the mere fact that a State's system 'creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny.' Bullock v. Carter, 405 U.S. 134, 143 [92 S.Ct. 849, 856, 31 L.Ed.2d 92, 100] (1972); Anderson, supra, 460 U.S., at 788 [103 S.Ct., at 1569-1570, 75 L.Ed.2d, at 557]; McDonald v. Board of Election Comm'nrs of Chicago, 394 U.S. 802 [89 S.Ct. 1404, 22 L.Ed.2d 739] (1969).

"Instead, as the full Court agreed in Anderson, supra, 460 U.S., at 788-789 [103 S.Ct., at 1569-1570, 75 L.Ed.2d, at 557-558]; id., at 808, 817 [103 S.Ct., at 1580, 1584-1585, 75 L.Ed.2d at 576] (Rehnquist, J., dissenting), a more flexible standard applies. A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' Id., at 789 [103 S.Ct., at 1570, 75 L.Ed.2d at 558]; Tashjian [v. Republican Party of Conn.], supra, 479 U.S. [208], at 213-214 [107 S.Ct., at 547-458, 93 L.Ed.2d 514, at 523 (1986)].

"Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' Norman v. Reed, 502 U.S. , [112 S.Ct. 698, 705, 116 L.Ed.2d 711, 723] (1992). But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions. Anderson, supra, 460 U.S., at 788 [103 S.Ct., at 1569-1570, 75 L.Ed.2d, at 557]; see also id., at 788-789, n. 9 [103 S.Ct., at 1569-1579, 75 L.Ed.2d at 557-558]." (Emphasis added.) 504 U.S. at , 112 S.Ct. at 2063-2064, 119 L.Ed.2d at 253-254.

The minor requirement imposed by R.C. 3599.09 that those persons producing campaign literature identify themselves as the source thereof neither impacts the content of their message nor significantly burdens their ability to have it disseminated. This burden is more than counterbalanced by the state interest in providing the voters to whom the message is

directed with a mechanism by which they may better evaluate its validity. Moreover, the law serves to identify those who engage in fraud, libel or false advertising. Not only are such interests sufficient to overcome the minor burden placed upon such persons, these interests were specifically acknowledged in Bellotti to be regulations of the sort which would survive constitutional scrutiny.

We therefore conclude that the requirement of R.C. 3599.09 that persons responsible for the production of campaign literature pertaining to the adoption or defeat of a ballot issue identify themselves as the source thereof is not violative of the right to free speech guaranteed by the First Amendment to the United States Constitution and Section 11, Article I of the Ohio Constitution.

Accordingly, the judgment of the court of appeals is affirmed.

Judgment affirmed.

Moyer, C.J., Douglas, Resnick, F.E. Sweeney and Pfeifer, JJ., concur.

Wright, J., dissents.

Wright, J., dissenting. I must dissent because I do not agree with the majority that R.C. 3599.09(A) imposes a "minor requirement" that "persons producing campaign literature identify themselves as the source thereof," nor do I agree that this requirement "neither impacts the content of their message nor significantly burdens their ability to have it disseminated." I am sure that Publius and Cato would have strenuously disagreed with the majority as well.

The most important ballot issue in the history of this country was the political campaign concerning ratification of the United States Constitution. One of the longest and most energetic campaigns occurred in New York. Both positions, for and against ratification, were vigorously debated. "Cato," believed to be New York Governor George Clinton, expressed the position of the opponents of ratification of the Constitution, the antifederalists. "Publius," a pseudonym used by Alexander Hamilton, John Jay and James Madison, expressed the position of the supporters of ratification of the Constitution, the federalists. "Many commentaries on the Constitution were written under pseudonyms, both to protect the author and to make full use of available symbols. Heroes of the Roman Republic were popular choices, because many were well-known symbols of republicanism." Roots of the Republic: American Founding Documents Interpreted (Schechter Ed. 1990), 293. Preeminent among the commentaries was The Federalist, the essays written by Hamilton, Jay and Madison under the pseudonym of Publius. Historians argue that a complete understanding of the purpose of The Federalist requires that it be seen as three documents in one. "It is a campaign document designed to win popular approval among the voters of New York State for the proposed Constitution; a serious work of political thought, analyzing the nature of free societies; and the authoritative commentary on the Constitution, reflecting the intent of the Framers of the Constitution." (Emphasis added.) Id. at 291. I think that James Madison, the author of the Bill of Rights, would be very surprised by the decision of the majority that a citizen does not have the right to issue anonymous statements

expressing her views on ballot issues.

Nor does the United States Supreme Court agree with the statement of the majority that disclosure requirements do not burden the ability to disseminate expressions of political views. That court has said that "[t]here can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." (Emphasis added.) Talley v. California (1960), 362 U.S. 60, 64, 80 S. Ct. 536, 538, 4 L.Ed.2d 559, 563. The court was concerned that compelled disclosure can chill the exercise of free expression by persons who hold unpopular views and who may fear reprisal for their views.

I believe that the majority minimizes the effect this statute has on the ability of individual citizens to freely express their views in writing on political issues. Many ballot issues, even ones of purely local interest, are controversial. School levies and other tax issues, and zoning issues all can generate strong opinions about their merits. Indeed, in this case, it is possible that the very filing of the charge against McIntyre was in some measure in retaliation for her opposition to the school levy. Certainly, the timing of the filing is suspect. McIntyre distributed the leaflets in April 1988, but the complaint was not filed until one year later. According to McIntyre, in the intervening period the school levy had been defeated twice but succeeded on the third attempt shortly prior to the filing of the complaint. It would appear that as soon as the levy was safely passed, the school district, in the person of the assistant superintendent of elementary education, sought retribution against McIntyre for her opposition. If the reasons espoused by the majority as justification for the constitutionality of the statute, i.e., educating the electorate and prevention of fraud in elections, were to be furthered, the charge should have been filed at the time of the purported offense, not one year and three elections later.

Since disclosure requirements can significantly burden freedom of expression, it remains for us to determine whether they are constitutional because of an overriding state interest. The majority traces a line of United States Supreme Court decisions to give the impression that the United States Supreme Court has implicitly ruled that disclosure requirements are constitutional and that the test to be applied is not a strict scrutiny test, in which the state must show a compelling state interest, but a lesser test satisfied merely by showing a legitimate state interest. Such is not the case. The error the majority makes is failing to distinguish the nature of the disclosure requirement (whether disclosure involves authorship of campaign literature, disclosure of contributions or expenditures) and the parties who are subject to the disclosure requirement (individuals, candidates, and/or organizations). R.C. 3599.09(A) requires disclosure of authorship of political opinions and applies to a wide range of disseminators of those political opinions, including individual citizens, candidates, political committees, political parties, for-profit corporations and non-profit corporations.

The United States Supreme Court has recognized such distinctions when considering the validity of election laws.

The court has indicated that restrictions which may be constitutionally valid against organizations may not be valid against individuals. For example, in the case of First Natl. Bank of Boston v. Bellotti (1978), 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707, cited by the majority, in which the court declared unconstitutional a state ban against corporate expenditures for the purpose of influencing votes on referenda issues, the court stated: "Nor is there any occasion to consider in this case whether, under different circumstances, a justification for a restriction on speech that would be inadequate [i.e., unconstitutional] as applied to individuals might suffice to sustain the same restriction as applied to corporations, unions or like entities." Id. at 777-778, 98 S.Ct. at 1416, 55 L.Ed.2d at 718, fn. 13. The Supreme Court has sustained ceilings on political contributions but held invalid limitations on independent expenditures by individuals and groups. Buckley v. Valeo (1976), 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed. 2d 659. In addition, the court has recognized a distinction between for-profit corporations' contributions concerning referenda issues and such contributions for candidates. Bellotti, supra, at 788, 98 S.Ct. at 1422, 55 L.Ed.2d at 725, fn. 26.

These distinctions must be kept in mind when considering the majority's reliance on the Supreme Court's dicta in footnote 32 in Bellotti, which the majority construes to mean that disclosure requirements are constitutional. Placed in the proper context, it is apparent that the Bellotti court's comments are limited to the facts of Bellotti (corporate expenditures), as the court expressly refers to disclosure requirements for "corporate advertising." Bellotti, supra, at 792, 98 S.Ct. at 1424, 55 L.Ed.2d at 728, fn. 32.

The case before us involves a challenge to R.C. 3599.09 as applied to an individual citizen, not a citizen who is a candidate, nor a political committee, a political party or a corporation. What is the proper test to be applied to determine whether the state has an interest sufficient to justify the restraint on a citizen's right of expression created by a disclosure requirement? The majority is correct that the United States Supreme Court has held that not every state election law must be subject to strict scrutiny. See Anderson v. Celebrezze (1983), 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed. 2d 547, and Burdick v. Takushi (1992), 504 U.S. ___, 112 S.Ct. 2059, 119 L.Ed. 2d 245. However the court has ruled that disclosure requirements do necessitate a strict scrutiny analysis: "We have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment ***. We long have recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since NAACP v. Alabama [ex rel. Patterson (1958), 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed 2d 1488] we have required that the subordinating interest of the State must survive exacting scrutiny." (Citations omitted.) Buckley v. Valeo (1976), 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659, 713. In the present case, the majority errs in applying the lesser standard of a showing of merely a legitimate state

interest.

Has the Ohio Elections Commission shown a compelling, not merely legitimate, interest in requiring the disclosure of the name and address of a citizen who distributes a pamphlet on a referendum issue?  The majority finds two state interests which are served by this requirement.  First, "providing the voters to whom the message is directed with a mechanism by which they may better evaluate its validity," and, second, "the law serves to identify those who engage in fraud, libel or false advertising."  With regard to the interest in educating the electorate, the majority appears to underestimate the electorate by suggesting that they are as moved by who supports a position as by the actual substance of the position.  A corollary to this proposition is that anonymity oftentimes forces one to think about the substance of the argument as opposed to focusing on the messenger.  In any event, I do not believe that the incremental value in education which is gained in knowing the name of an individual who advocates a position is a sufficiently compelling interest to justify the restraint on freedom of expression.

I recognize the state's interest in assuring that information disseminated about candidates and issues is not fraudulent, false or libelous.  Indeed, as an elected official, I am most sympathetic and supportive of this goal.  Anyone in public office shares the concern that he or she not be subjected to false accusations.  However, under the strict scrutiny test, the statute must be narrowly tailored to further the state's compelling interest.  The most direct way to further this interest is to proscribe the dissemination of false, fraudulent or libelous information.  This the state has done in R.C. 3599.091(B) and 3599.092(B)(2).  One commentator has suggested a way in which a state may narrowly tailor a disclosure requirement so that the statute bears a more direct relationship to furtherance of the state's interest:

"*** [A] state might choose to limit disclosure requirements to advertisements in newspapers, major periodicals, and the broadcast media.  These media have the widest circulation and, arguably, the greatest impact on voters. ***"  Note, Developments in the Law, Elections (1975), 88 Harv.L.Rev. 1111, 1292, fn. 323.  R.C. 3599.09(B) is directed at these types of communications.

Removing the requirement that an individual citizen place his or her name and residence address on leaflets does not prevent the state from pursuing the goal of preventing the dissemination of false information.  A person who disseminates false information can be charged with such a violation whether or not his or her name is on the literature.  Admittedly it will require additional investigation to determine the source of such a publication.  However, the present case clearly shows that the omission of a name on a leaflet does not prevent discovery of the author.  Indeed, the identity of the author will always be known in order to file a charge alleging violation of R.C. 3599.09(A).  If the author has disseminated false, fraudulent or libelous information, the proper course to further the state's interest is to charge the person with a violation of R.C. 3599.091(B) or 3599.092(B)(2), not to charge the person with a violation of R.C. 3599.09(A).  Since removing

the disclosure requirement for individual citizens will not prevent the state from accomplishing its goal, while disclosure, at best, will merely assist it, I do not find the state's interest has been furthered in the way which is least restrictive of freedom of expression.

I find it notable that each of the judges below who reviewed this case was seriously troubled by the potential unconstitutionality of the statute as applied to McIntyre. The trial court ruled that the statute was unconstitutional as applied to McIntyre. Judge Whiteside agreed with the trial court. Even the majority opinion of the court of appeals, overruling the trial court, expressed serious concern for the constitutionality of the statute as applied to McIntyre, but felt compelled to follow the precedent of this court in State v. Babst (1922), 104 Ohio St. 167, 135 N.E. 525. The court noted, "[i]n the final analysis, while Babst presents obvious deficiencies, the syllabus thereof is so broad that we continue to feel bound thereby; and, if R.C. 3599.09(A) be constitutional on its face as Babst decided, we are unable to conclude that it is unconstitutional as applied to [McIntyre] herein. Nonetheless, given the more recent United States Supreme Court cases, this case presents a substantial issue for further analysis by the Supreme Court."

The "obvious deficiencies" in Babst, referred to by the appellate court, are that it "contains no discussion of whether the state interest in prohibiting anonymous political communications was sufficiently compelling to warrant the abridgment of free speech imposed by G.C. 13343-1 and, if so, whether the statute therein was narrowly tailored to serve that compelling state interest." When these questions are answered, particularly in light of Talley, I believe the appropriate conclusion is that R.C. 3599.09(A) is not narrowly tailored to serve a compelling state interest and is, therefore, unconstitutional as applied to McIntyre.

For the foregoing reasons, I respectfully dissent.