[No. S029701. Nov. 28, 1994.]

DANIEL GRISET et al., Plaintiffs and Appellants, v.
FAIR POLITICAL PRACTICES COMMISSION, Defendant and
Respondent.

852

**COUNSEL**

Reed & Davidson and Darryl R. Wold for Plaintiffs and Appellants.

Bell, McAndrews & Hiltachk, Charles H. Bell, Jr., Altshuler, Berzon, Nussbaum, Berzon & Rubin, Lowell Finley, Olson, Hagel, Fong, Leidigh, Waters & Fishburn and Robert E. Leidigh as Amici Curiae on behalf of Plaintiffs and Appellants.

Jeff Marschner, Scott Hallabrin, Jeevan S. Ahuja, Deanne Stone, Jonathan S. Rothman and Steve Churchwell for Defendant and Respondent.

Lisa Foster, Munger, Tolles & Olson and Bradley S. Phillips as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**KENNARD, J.**—This is a case about anonymity and the political process. Government Code section 84305[1] requires that candidates for public office, and individuals or groups supporting or opposing a candidate or ballot measure, must identify themselves on any mass mailings they send to prospective voters. In this case, a candidate for city council and two committees he controlled sent prospective voters five mass mailings that did not contain the identifying information required by statute. When the government agency responsible for enforcing the statute brought administrative charges against the candidate and the two committees he controlled, the candidate brought this lawsuit challenging the constitutionality of the statute. He argues that persons who send prospective voters mass mailings designed to influence the outcome of an election are entitled, under the First Amendment to the United States Constitution, to remain anonymous, and that section 84305's requirement that such persons identify themselves is therefore unconstitutional.

We conclude that section 84305 does not violate the First Amendment rights of candidates or candidate-controlled committees.

---

[1] All further unlabeled statutory references are to the Government Code.

## I

Daniel Griset was a candidate for reelection to the Santa Ana City Council in 1988. During the month before the election, the Griset Campaign Committee, which Griset controlled, sent prospective voters a mass mailing carrying the letterhead of the "Washington Square Neighborhood Association." The mailing failed to identify Griset or the Griset Campaign Committee as the sender. During the same month, the Santa Ana Progress Committee, also controlled by Griset, sent prospective voters four mass mailings attacking Griset's opponent, Rick Norton. The mailings—entitled "Meet the Real Rick Norton," "Swap Meet," "The 7 Lies Swap Meet Owner Rick Norton Wants You to Believe," and "Beware of Tricksters"—each identified the Santa Ana Progress Committee as the sender, but none of the mailings identified Griset as the controlling candidate.

In March 1990, the Fair Political Practices Commission (FPPC) named Griset (who won the election), the Griset Campaign Committee, and the Santa Ana Progress Committee as respondents in an enforcement action, alleging that they had violated section 84305 by sending the five mass mailings described above. Griset then filed a lawsuit to enjoin the FPPC proceedings. The trial court denied Griset's motion for a preliminary injunction, and the enforcement action proceeded. Based on stipulated facts, the FPPC found that Griset had committed five violations of section 84305. The FPPC imposed a $2,000 fine against Griset and the Griset Campaign Committee, and an $8,000 fine against Griset and the Santa Ana Progress Committee.

The validity of section 84305 was not an issue in the administrative proceedings. Following the conclusion of those proceedings and the imposition of a fine on plaintiffs, plaintiffs added a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5) as a cause of action in the pending suit for declaratory and injunctive relief. They contended there that the statute was invalid as applied and on its face. In response to plaintiffs' subsequent motions for issuance of a peremptory writ on that cause of action and for summary adjudication and judgment in the action for declaratory and injunctive relief, the trial court denied the petition for writ of mandate. In so doing it ruled that, while there was a possibility that section 84305 might be invalid in other circumstances, the administrative action involved only candidates and their controlled committees.

The court then entered separate orders. The first denied the petition for writ of administrative mandamus. The second denied plaintiffs' motions for summary adjudication and judgment on the causes of action seeking declaratory and injunctive relief. Plaintiffs appealed only from the order denying their petition for writ of mandate.

The Court of Appeal recognized the limited basis of the trial court's ruling, agreed that section 84305 was not invalid as applied to plaintiffs, and affirmed the trial court order denying the petition for writ of administrative mandamus. Notwithstanding that conclusion, the court also considered the facial validity of the statute as it might apply not only to candidates and their controlled committees, but to all persons and entities potentially subject to its disclosure requirement. Because we agree that section 84305 is valid as applied to plaintiffs, we need not reach the broader question addressed by the Court of Appeal. We therefore affirm the judgment of the Court of Appeal, but express no view regarding the validity of section 84305 as applied to persons and entities other than candidates and their controlled committees.

In part II.A., we set forth the text of section 84305 and related statutes. In part II.B., we review the leading cases from the United States Supreme Court that govern the question whether a statute that bars anonymous mailings in political campaigns violates the First Amendment rights of candidates or candidate-controlled committees. In part III, we apply the principles derived from precedent to analyze the constitutionality of section 84305.

II

A

Section 84305, the challenged statute, provides:

"(a) Except as provided in subdivision (b), no candidate or committee shall send a mass mailing unless the name, street address, and city of the candidate or committee are shown on the outside of each piece of mail in the mass mailing and on at least one of the inserts included within each piece of mail of the mailing in no less than 6-point type which shall be in a color or print which contrasts with the background so as to be easily legible. A post office box may be stated in lieu of a street address if the organization's address is a matter of public record with the Secretary of State.

"(b) If the sender of the mass mailing is a single candidate or committee, the name, street address, and city of the candidate or committee need only be shown on the outside of each piece of mail.

"(c) If the sender of a mass mailing is a controlled committee, the name of the person controlling the committee shall be included in addition to the information required by subdivision (a)."

Section 82041.5 defines "mass mailing" in these words: " 'Mass mailing' means over two hundred substantially similar pieces of mail, but does not

include a form letter or other mail which is sent in response to an unsolicited request, letter or other inquiry."[2]

## B

Although the United States Supreme Court has never addressed the precise question that confronts us—whether a statute that prohibits anonymous mass mailings by candidates or candidate-controlled committees in political campaigns violates the First Amendment—the high court in several opinions has discussed the degree to which government entities may compel the identification of persons engaged in activities protected by the First Amendment.

In three cases, all decided between 1958 and 1960, the high court rejected as unconstitutional attempts by state and local governments to require disclosure of names of persons exercising their First Amendment rights. *N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449 [2 L.Ed.2d 1488, 78 S.Ct. 1163] is the first of these cases. There, the State of Alabama sought to compel the National Association for the Advancement of Colored People (NAACP), a civil rights organization, to produce a list of all its members in the state, contending that the list was relevant to pending litigation to determine whether the organization was conducting intrastate business in violation of the state's foreign corporation registration statute. The NAACP showed that on previous occasions revealing the identity of its members had subjected those members to economic reprisals and physical threats. The high court held that the state could not compel the NAACP to disclose its membership list. The court explained that the state's justification for ordering disclosure was inadequate to justify "the deterrent effect on the free enjoyment of the right to associate" that disclosure was likely to cause. (*Id.* at p. 466 [2 L.Ed.2d at p. 1502].)

---

[2]Section 82013 defines the term "committee" as follows: " 'Committee' means any person or combination of persons who directly or indirectly does any of the following: [¶] (a) Receives contributions totaling one thousand dollars ($1,000) or more in a calendar year. [¶] (b) Makes independent expenditures totaling one thousand dollars ($1,000) or more in a calendar year; or [¶] (c) Makes contributions totaling ten thousand dollars ($10,000) or more in a calendar year to or at the behest of candidates or committees."

As to the meaning of "controlled committee," section 82016 states: " 'Controlled committee' means a committee which is controlled directly or indirectly by a candidate or state measure proponent or which acts jointly with a candidate, controlled committee or state measure proponent in connection with the making of expenditures. A candidate or state measure proponent controls a committee if he, his agent or any other committee he controls has a significant influence on the actions or decisions of the committee."

The statutory scheme does not define "sender." But the FPPC has, by regulation, defined "sender" as "the candidate or committee who pays for the largest portion of expenditures attributable to the designing, printing, and posting of the mailing . . . ." (Cal. Code Regs., tit. 2, § 18435, subd. (b).)

In the second case, *Bates* v. *Little Rock* (1960) 361 U.S. 516 [4 L.Ed.2d 480, 80 S.Ct. 412], the governmental entities advanced a different justification for compelling disclosure, but the result was the same as in *N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. 449. In *Bates,* ordinances of two Arkansas cities required nonprofit organizations to provide the cities with lists of the names of local members. The local branches of the NAACP refused to provide such lists; they showed that public identification of their members had in the past led to harassment and threats of injury, and that economic reprisals were likely to follow disclosure. The high court rejected the cities' claim that disclosure was necessary to determine whether the NAACP was entitled to tax-exempt status, reasoning that although the asserted governmental purpose was "fundamental," the cities had not shown that disclosure bore a "reasonable relationship" to the achievement of that purpose, whereas disclosure would significantly impair the associational rights of the members of the NAACP.

The third case to consider the rights to anonymity of persons engaged in First Amendment activities did not involve the associational rights upheld in *N.A.A.C.P.* and *Bates*; rather, as in this case, it concerned the right to anonymity for persons engaged in political speech. In *Talley* v. *California* (1960) 362 U.S. 60, 61 [4 L.Ed.2d 559, 561, 80 S.Ct. 536], the high court considered the validity of a Los Angeles ordinance that prohibited the distribution of " 'any hand-bill in any place under any circumstances' " that did not have on its face the name and address of the " 'person who printed, wrote, compiled or manufactured' " it, and the name and address of the person who distributed it.

The high court invalidated the ordinance because it abridged the First Amendment by requiring persons circulating handbills to identify themselves. The court explained that "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance" (*Talley* v. *California, supra,* 362 U.S. at p. 65 [4 L.Ed.2d at p. 563]), pointing out that anonymous writings and documents published under fictitious names (e.g., the Federalist Papers) had played an important and beneficial historical role in the political process in this country and in England. The court rejected the claim made by the City of Los Angeles that the ordinance was necessary to identify persons responsible for fraud, false advertising, and libel, noting that the ordinance was not limited in a manner directed to identify those engaged in such conduct.

Thus, in the three cases discussed above, the United States Supreme Court established that governmental entities may not, absent substantial justification, compel those engaged in First Amendment activities to identify themselves when identification would impair their ability to engage in those

activities; the high court also established that any statute requiring disclosure must bear a reasonable relationship to the asserted governmental purpose and must be narrowly tailored to achieve that purpose. But in two more recent cases, the high court has held that the government's need to ensure the integrity and reliability of the electoral process will, at least in some instances, provide an adequate justification to compel those exercising their First Amendment rights to identify themselves. These two cases are *Buckley* v. *Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612] (hereafter *Buckley*), and *First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765 [55 L.Ed.2d 707, 98 S.Ct. 1407].

In *Buckley, supra,* 424 U.S. 1, a landmark decision on election reform law, the United States Supreme Court upheld the constitutionality of federal laws requiring compulsory disclosure to federal election officials of the identities of persons making political campaign contributions or expenditures greater than $10, and public disclosure of contributors giving more than $100. The court summarized the general principles: "[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment. [Citations.] [¶] . . . [S]ignificant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest. Since *N.A.A.C.P.* v. *Alabama* [*supra,* 357 U.S. 449] we have required that the subordinating interests of the State must survive exacting scrutiny. We have also insisted that there be a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." (*Buckley, supra,* 424 U.S. at p. 64 [46 L.Ed.2d at p. 713], fns. omitted.)

In *Buckley, supra,* 424 U.S. 1, the government asserted three justifications for compelling disclosure of the names of those making political contributions: (1) to "allow[] voters to place each candidate in the political spectrum . . . [and to] alert the voter to the interests to which a candidate is most likely to be responsive"; (2) to "deter actual corruption and avoid the appearance of corruption by exposing large contributions . . . to the light of publicity"; and (3) to enable election officials to gather "the data necessary to detect violations of the contribution limitations [of the federal elections law]." (424 U.S. at pp. 67-68 [46 L.Ed.2d at pp. 715-716], fn. omitted.) The court found that these interests were "sufficiently important to outweigh the possibility of infringement" of First Amendment rights because, in part, disclosure "provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek federal office." (424 U.S. at pp. 66-67 [46 L.Ed.2d at pp. 714-715], fn. omitted.)

Thereafter, in *First National Bank of Boston* v. *Bellotti, supra,* 435 U.S. 765, the high court struck down a statute that made it unlawful for a business corporation to make contributions or expenditures to influence the vote on any ballot measure question, except one that materially affected the property, business, or assets of the corporation. In the course of its analysis, the court commented on the power of government entities to compel disclosure of those engaged in political speech, observing that voters were entitled to consider "the *source* and credibility" of those who advocated positions in electoral campaigns. (435 U.S. at pp. 791-792 [55 L.Ed.2d at pp. 727-728], italics added.) The court went on to explain: "Corporate advertising, unlike some methods of participation in political campaigns, is likely to be highly visible. *Identification of the source of advertising may be required as a means of disclosure*, so that the people will be able to evaluate the arguments to which they are being subjected. [Citations.] In addition, we emphasized in *Buckley* [*supra,* 424 U.S. 1] the prophylactic effect of requiring that the source of the communication be disclosed." (*First National Bank of Boston* v. *Bellotti, supra,* 435 U.S. at p. 792, fn. 32 [55 L.Ed.2d at pp. 727-728], italics added.)

■ In short, what we learn from these five decisions of the United States Supreme Court is this: Courts must carefully examine governmental limitations on the right of those who wish to remain anonymous while exercising their First Amendment rights. In some circumstances, however, the government's interests in conducting fair and honest elections and in providing prospective voters with the information necessary to make an informed choice may justify a requirement that persons identify themselves when they engage in speech designed to influence the outcome of elections. Whether these governmental interests permit us to uphold the constitutionality of section 84305, which prohibits anonymous mass mailings by candidates or candidate-controlled committees in election campaigns, is the issue we explore below.

### III

■ As noted earlier, Griset, a candidate for public office, violated section 84305, which requires that candidates for public office, and individuals and groups supporting or opposing a candidate or ballot measure, must identify themselves in any mass mailings they send to prospective voters. Griset attacks that portion of the Court of Appeal's opinion upholding the constitutionality of the statute as applied to mass mailings by candidates and their controlled committees in elections for public office.

Griset contends that section 84305 implicates the First Amendment because it prohibits anonymous political speech. ■ As he points out,

political speech is at the core of the First Amendment: " '[T]he First Amendment "has its fullest and most urgent application" to speech uttered during a campaign for political office.' " (*Burson* v. *Freeman* (1992) 504 U.S. 191 [119 L.Ed.2d 5, 12, 112 S.Ct. 1846, 1850].) ▮▮▮ By requiring candidates and the committees they control that send mass mailings to identify themselves, Griset argues, section 84305 has a chilling effect on those who would like to engage in political speech. Thus, he asserts, it is similar to an ordinance requiring the authors of handbills to identify themselves, such as the one that the high court struck down in *Talley* v. *California*, *supra*, 362 U.S. 60. In Griset's view, a statute that infringes First Amendment rights may be upheld only if it is narrowly tailored to serve a compelling governmental interest. Section 84305, Griset contends, does not serve "sufficiently legitimate" governmental interests, and is not tailored narrowly enough to survive constitutional scrutiny.

Griset is correct that section 84305 implicates First Amendment rights because it prohibits anonymous political speech. In this respect, it does not differ from the ordinance of the City of Los Angeles that the United States Supreme Court invalidated in *Talley* v. *California*, *supra*, 362 U.S. 60. As the high court said in *Talley:* "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." (362 U.S. at p. 64 [4 L.Ed.2d at pp. 562-563].)

The second proposition of Griset's argument—that a statute prohibiting anonymous mass mailings in political campaigns may be upheld only if it is narrowly tailored to serve a compelling governmental interest—has not been conclusively resolved. This is the test most frequently applied to statutes or ordinances that burden First Amendment freedoms, and it was applied by the high court when, in *Burson* v. *Freeman*, *supra*, 504 U.S. 191, it upheld a Tennessee law prohibiting the solicitation of votes and the display or distribution of campaign materials within 100 feet of the polls. But in *Buckley*, *supra*, 424 U.S. at page 64 [46 L.Ed.2d at p. 713], the United States Supreme Court phrased the standard in somewhat different terms: "[T]he subordinating interests of the State must survive exacting scrutiny [and there must be] a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed." (Fns. omitted.)

Moreover, there is recent authority from the United States Supreme Court indicating that, in at least some election law cases, a lesser degree of scrutiny may be appropriate. In *Burdick* v. *Takushi* (1992) 504 U.S. 428 [119 L.Ed.2d 245, 112 S.Ct. 2059], the high court held that a state statute prohibiting

voters from casting write-in votes for candidates did not violate the First Amendment. In reaching this conclusion, the court explained that the compelling interest test need not invariably be applied in election law cases: "[T]he rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. . . . [W]hen those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' [Citation.] But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." (*Id.* at pp. ___-___ [119 L.Ed.2d at pp. 253-254, 112 S.Ct. at pp. 2063-2064].)

Earlier this year, the high court granted review of an Ohio case in which it is likely to shed further light on the appropriate standard to apply in assessing the constitutionality of election laws. In *McIntyre* v. *Ohio Elections Comm.* (1993) 67 Ohio St.3d 391 [618 N.E.2d 152], certiorari granted February 22, 1994, ___ U.S. ___ [127 L.Ed.2d 370, 114 S.Ct. 1047], the Ohio Supreme Court determined that the relaxed standard of constitutional scrutiny set forth in *Burdick* v. *Takushi, supra,* 504 U.S. 428, applied to a challenge to a state law prohibiting distribution of campaign literature that did not identify the sponsor or responsible person. Concluding that the law imposed only a minor burden that was justified by the state's interest in an informed electorate, the Ohio court upheld the law against a First Amendment challenge.[3]

In this case, we need not decide whether we agree with the Ohio Supreme Court that the relaxed standard enunciated in *Burdick* v. *Takushi, supra,* 504 U.S. 428, governs cases, such as this one, involving the rights of candidates and candidate-controlled committees who wish to influence voters. Whether we use a "compelling interest" test, the test the high court articulated in *Buckley, supra,* 424 U.S. 1, or the one in *Burdick*, we conclude that section 84305 as applied to candidates and candidate-controlled committees survives First Amendment scrutiny.

The state's interests that justify section 84305 are compelling. The statute is part of the Political Reform Act of 1974 (§ 81000 et seq.) The provisions

---

[3]The Ohio Supreme Court is not the first court to pass on the constitutional validity of a statute that prohibits anonymous political advertising. (Compare *United States* v. *Insco* (M.D. Fla. 1973) 365 F.Supp. 1308 [upholding statute] revd. on other grounds (5th Cir. 1974) 496 F.2d 204; *United States* v. *Scott* (D.N.D. 1961) 195 F.Supp. 440 [same]; and *Morefield* v. *Moore* (Ky. 1976) 540 S.W.2d 873 [same] with *State* v. *North Dakota Ed. Ass'n.* (N.D. 1978) 262 N.W.2d 731 [4 A.L.R.4th 724] [holding statute unconstitutional]; *Commonwealth* v. *Dennis* (1975) 368 Mass. 92 [329 N.E.2d 706]; and *State* v. *Fulton* (La. 1976) 337 So.2d 866 [holding statute unenforceable]; see Annot., Validity and Construction of State Statute Prohibiting Anonymous Political Advertising (1981) 4 A.L.R.4th 741.)

of the act requiring disclosure of expenditures in election campaigns have two purposes: to inform the electorate and to prevent corruption of the electoral process. (§ 81002, subd. (a).) These interests have been held to be compelling. (*Socialist Workers etc. Committee* v. *Brown* (1975) 53 Cal.App.3d 879, 888-889 [125 Cal.Rptr. 915].) Here, the FPPC asserts that both of these interests justify the requirements of section 84305.

The primary interest asserted by the FPPC in support of the statute at issue—to provide the voters with information to aid them in making their choices at the ballot box—is virtually identical to the primary interest asserted by the federal government in *Buckley*, *supra*, 424 U.S. 1, 66-67 [46 L.Ed.2d 659, 714-715]: that is, to assure that the electorate has information regarding the source of political campaign funds so as to enable the voters to better evaluate candidates for public office.

This governmental interest is of sufficient magnitude to permit the restriction on the First Amendment rights of candidates (and committees controlled by them) who wish to send political mass mailings anonymously. In *Buckley*, *supra*, the high court characterized as "substantial" the government's interest in providing the electorate with information to aid the voters in evaluating candidates for public office. (424 U.S. at pp. 66-68 [46 L.Ed.2d at pp. 714-716].) Here, in determining the constitutionality of section 84305, we must consider this state interest against the extent of the burden the statute places on candidates and committees they control. (424 U.S. at p. 68 [46 L.Ed.2d at pp. 715-716].)

Section 84305 does not in any way prohibit the communication of ideas. It does not attempt to regulate the content of expression. Nor does it restrict the quantity of speech. It merely requires sender identification for a narrow range of public speech—speech designed to influence the outcome of an election. Thus, the restraint on First Amendment freedoms is carefully limited.

On the other hand, as stated earlier, the state's interest in a well-informed electorate is a compelling one. Section 84305 seeks to further the First Amendment values of informed and open political debate and exercise of the electoral franchise. And, in requiring candidates and the committees controlled by them to disclose their identities in mass mailings, the statute is narrowly drawn to meet that goal. Voters have a vital interest in learning the views of those who seek to govern them, for only through learning these views can the voter intelligently decide who to vote for. A candidate, whose identity is known and who is seeking public office, has a lesser interest in anonymity. The statute does not require disclosure of a wide range of

information pertaining to the candidate or committee responsible for the mass mailing; it merely requires disclosure of the name and address of the candidate or committee, and, when mailings are sent by a candidate-controlled committee, the name of the controlling candidate. The disclosure must be made with the mailing itself, so that the voter will have the information when he or she reviews the mailing. (See *Buckley*, *supra*, 424 U.S. at p. 68, fn. 82 [46 L.Ed.2d at pp. 715-716] [holding that postelection disclosure by successful candidates would not serve the important informational function played by pre-election reporting].) Thus, the statute requires a minimal disclosure of information precisely at a highly relevant time.

There may be instances when the requirement of sender identification on mass mailings will deter candidates from making mass mailings. (See *Buckley*, *supra*, 424 U.S. at p. 68 [46 L.Ed.2d at pp. 715-716].) Faced with a requirement that they identify themselves in all election-related mass mailings, candidates may choose not to send certain mailings at all. But in our view, instances in which candidates are deterred from mailing relevant, *truthful* information about themselves or their opponents will be rare, because with or without anonymity, the candidates' own desire to win the election will encourage candidates to inform voters of their views and to provide prospective voters with unfavorable information concerning their opponents. Candidates may, however, be deterred from sending *deceptive* mailers. (See *Canon* v. *Justice Court* (1964) 61 Cal.2d 446 [39 Cal.Rptr. 228, 393 P.2d 428].) In *Canon*, the court considered the constitutional validity of former Elections Code section 12047, which made it unlawful to write or distribute literature making personal attacks on candidates for public office unless the writing contained the name and address of the printer and either the names and addresses of two officers of the organization issuing it, or the name and address of " 'some voter of this State, who is responsible for it.' " (61 Cal.2d at p. 460.) Although we invalidated the statute on the ground that it discriminated against persons who were not California voters, we rejected as "unsound" the contention that the statute violated the state and federal constitutional guarantees of freedom of speech. (61 Cal.2d at p. 451.) We explained: "[A]nonymity all too often lends itself, in the context of attacks upon candidates in the preelection period, to smears, as a result of which the electorate is deceived. Identification permits confrontation and often makes refutation easier and more effective. It tends to reduce irresponsibility. It enables the public to appraise the source." (61 Cal.2d at p. 459.)

Like former Elections Code section 12047, which was at issue in *Canon* v. *Justice Court*, *supra*, 61 Cal.2d 446, section 84305 tends to prevent smear attacks on candidates for public office, while permitting the candidate attacked to confront his or her accuser and to rebut the accusations. This is

likely to reduce irresponsible attacks on candidates for public office and it will enable the voting public to appraise the source of the attacks, thereby assisting them in giving the attacks the weight they deserve. These important public purposes, which we relied upon in *Canon* to conclude that former Elections Code section 12047 did not violate the First Amendment, support our conclusion in this case that section 84305, too, withstands constitutional scrutiny.

Here, in arguing that section 84305's failure to distinguish between protected and unprotected speech is a defect that renders that statute unconstitutional, Griset places substantial reliance on a Court of Appeal decision, *Schuster* v. *Municipal Court* (1980) 109 Cal.App.3d 887 [167 Cal.Rptr. 447] (hereafter *Schuster*). That case, however, does not aid him, as we shall explain.

*Schuster*, *supra*, 109 Cal.App.3d 887, addressed the constitutional validity of former Elections Code section 29410, which made it a misdemeanor for any person to reproduce any written matter relating to an election unless the matter reproduced contained the name and address of the business or residence of a person responsible for it, or of a registered campaign committee. The court held that former Elections Code section 29410's identification requirement violated the First Amendment. It distinguished the statute from the one at issue in *Canon* v. *Justice Court*, *supra*, 61 Cal.2d 446, on the basis that the statute in *Canon* reached only false and defamatory speech that was not protected by the First Amendment. (109 Cal.App.3d at p. 895.) The *Schuster* court also distinguished the high court's decision in *Buckley*, *supra*, 424 U.S. 1, which upheld compulsory disclosure of the identities of those who make political campaign contributions or expenditures. As discussed in part II.B., *ante*, the governmental interests at stake in *Buckley* were (1) promoting an informed electorate, (2) deterring corruption by making public large contributions and expenditures, and (3) gathering information in order to detect violations of the contribution limitations of the federal law. (*Buckley*, *supra*, 424 U.S. at pp. 67-68 [46 L.Ed.2d at pp. 715-716].) In *Schuster*, the Court of Appeal concluded that because only *one* of the three interests present in *Buckley*—the compelling state interest in promoting an informed electorate—was present in the case before it, *Buckley* was distinguishable. (*Schuster*, *supra*, 109 Cal.App.3d at pp. 898-899.)

But *Buckley*, *supra*, 424 U.S. 1, is not so easily distinguished. The United States Supreme Court has never indicated that the constitutional validity of a statute depends on the number of governmental interests that are alleged to be served by the statute. Although the court in *Buckley* was confronted with an assertion of multiple governmental interests, the high court never suggested that any one of these interests, standing alone, would be insufficient.

Relying on the Court of Appeal's decision in *Schuster, supra,* 109 Cal.App.3d 887, Griset contends that only false or defamatory speech can be subject to compelled disclosure. This theory, however, cannot be reconciled with the high court's decision in *Buckley, supra,* 424 U.S. 1, which upheld the constitutionality of disclosure requirements *not* aimed at false or defamatory speech. (*Id.* at pp. 65-68 [46 L.Ed.2d at pp. 713-716].)

Griset also argues that the government's interest in the integrity of the electoral process is too "abstract" to adequately justify section 84305. He reasons that even if this governmental interest is a compelling one, section 84305, as written, will not implement it. We disagree.

The facts of this case demonstrate how section 84305 operates directly to preserve the integrity of the electoral process. Griset sent at least one mass mailing—purporting to be from the Washington Square Neighborhood Association—that attacked third parties for actions favorable to Griset's opponent while omitting any information that would tell the reader that Griset and his committee paid for the mass mailing. Prospective voters reading this mass mailing may have been deceived into believing that this mailing came from a "grass-roots" group of concerned neighbors, rather than from a candidate for public office. Had Griset complied with section 84305, the prospective voters reading the mass mailing would have been better able to give it the weight it deserved.[4]

Additionally, Griset argues that the high court's decision in *Buckley, supra,* 424 U.S. 1, does not support the FPPC's position because in *Buckley* the court distinguished between expenditure limitations, which are "direct" restrictions of speech and were invalidated by the court, and contribution limits, which "involve[] little direct restraint on . . . political communication" and were upheld. (424 U.S. at p. 21 [46 L.Ed.2d at p. 689].) According to Griset, section 84305's requirement that senders of mass mailings identify themselves is a "direct" restriction of speech equivalent to an expenditure limitation, and therefore invalid.

This is unpersuasive. In *Buckley, supra,* 424 U.S. 1, the court equated the quantity of an individual's or group's expenditures on political campaigns with the quantity of speech. "A restriction on the amount of money a person or group can spend on political communication . . . necessarily reduces the

---

[4]Amicus curiae California Political Attorneys Association argues that the application and enforcement of section 84305 by the FPPC in past administrative cases shows that it is not narrowly tailored to further a compelling state interest. But the manner in which the FPPC has applied the statute in past enforcement decisions tells us nothing about whether the statute is, as Griset contends, unconstitutional insofar as it applies to candidates and their controlled committees, or as applied in this case.

quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." (*Id.* at p. 19 [46 L.Ed.2d at pp. 687-688], fn. omitted.) By contrast, a mass mailing identification statute such as section 84305 does not "necessarily reduce[] the quantity of expression"; candidates and the committees they control remain free to discuss as many issues as they wish in as many mailings as they can afford, and to explore these issues in any depth. Section 84305 merely requires that they identify themselves to the prospective voters whom they seek to persuade. Griset does not claim, nor could he, that a candidate for public office has a legitimate interest in expressing the candidate's views anonymously.

By requiring candidates and the committees they control to identify themselves in their mass mailings, section 84305 is narrowly tailored to serve a compelling state interest: to provide the voters with important information to assist them in making a reasoned choice at the polls, the ultimate expression of their First Amendment rights. Accordingly, we conclude that as applied to candidates and their controlled committees section 84305 does not violate the First Amendment.[5]

IV

The Court of Appeal correctly held that section 84305, which requires the senders of mass mailings in political campaigns to identify themselves, is not unconstitutional as applied to candidates and candidate-controlled committees.

---

[5]Griset also asserts that section 84305 violates the "liberty of speech" clause of the California Constitution, which states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).) Griset, however, presents no argument on this provision of our state Constitution apart from his argument based on the First Amendment. Instead, he relies on *Schuster, supra,* 109 Cal.App.3d 887, in which the Court of Appeal held former Elections Code section 29410 violative of the state constitutional protection of speech. But *Schuster* itself offered no analysis demonstrating that application of the state Constitution required a different analysis or led to a different result than application of the federal charter.

As a general matter, the liberty of speech clause in the California Constitution is more protective of speech than its federal counterpart. (See, e.g., *Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116] [state free speech guarantee is "more definitive and inclusive than the First Amendment"].) We are not persuaded, however, that the state Constitution requires a different analysis or result on the narrow question that we address in this case. Indeed, the challenged statute is in conformance with the literal terms of the liberty of speech clause; it does not restrain Griset as a candidate, or committees he controls, from freely expressing his views in any way, but merely requires that he identify himself, or, in other words, that he "be[ ] responsible for the abuse of this right." (Cal. Const., art. I, § 2, subd. (a).)

The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Mosk, J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.